**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**Case No. 1:21-cv-239-MR-WCM**

| | | |
|---|---|---|
| CHATTOOGA CONSERVANCY, INC., | ) | |
| CRAIG PROBST, and NANCY PROBST, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **CONSENT DECREE** |
| | ) | |
| HIGH HAMPTON LAND, LLC, | ) | |
| HIGH HAMPTON RESORT, LLC, | ) | |
| DANIEL COMMUNITIES, LLC, and | ) | |
| DANIEL COMMUNITIES | ) | |
| MANAGEMENT CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## I.     STIPULATIONS.

Plaintiff Chattooga Conservancy, Inc. (the "Chattooga Conservancy") is a non-profit membership corporation advancing protection and enjoyment of the Chattooga River, its tributaries, and their watersheds.

Plaintiff Craig Probst and his wife Plaintiff Nancy Probst (the "Probsts"), are residents of North Carolina and members of the Chattooga Conservancy. Mr. Probst owns real property containing a home on Fowler Creek.

Defendants High Hampton Land, LLC, High Hampton Resort, LLC, Daniel Communities, LLC, and Daniel Communities Management Corporation (collectively, "Defendants") are affiliates of one another and have been engaged in

the development and redevelopment of property in Jackson County, North Carolina in the headwaters of Fowler Creek (hereinafter referred to as the "High Hampton property").

The High Hampton property, which was acquired by Defendants in 2017, features two forks of Fowler Creek and two small lakes that are fed by branches of the eastern fork Fowler Creek. Fowler Creek flows downstream from the High Hampton property past the Probsts' property and ultimately joins with the Chattooga River. Fowler Creek and its tributaries are designated as Class B, Tr+ and Class C, Tr+ waters under North Carolina law. The Chattooga River is a National Wild and Scenic River under federal law and its waters are Outstanding Resource Waters under North Carolina law.

Since 2018, Defendants have been engaged in the development and redevelopment of the High Hampton property.

Pursuant to 33 U.S.C. § 1344, also known as Section 404 of the CWA, Defendants applied to the U.S. Army Corps of Engineers ("USACE") and were granted a permit to allow for discharge of dredged or fill material into portions of Fowler Creek on the High Hampton property. Under 33 U.S.C. § 1341, also known as Section 401 of the CWA, and applicable North Carolina law, Defendants also applied for and received a Section 401 Water Quality Certification with certain conditions from the North Carolina Department of Environmental Quality ("DEQ"),

2

Division of Water Resources. Pursuant to 33 U.S.C. § 1342, also known as Section 402 of the CWA, and North Carolina law, Defendants provided notice of their intent to be governed by and comply with general permit NCG010000 ("NPDES Permit") by the DEQ.

Plaintiffs issued a notice of intent to sue letter dated April 14, 2021, under section 505 of the Clean Water Act ("CWA"), 33 U.S.C. § 1365, and under North Carolina law alleging that Defendants were responsible for land-disturbing activities in past and ongoing violation of certain terms and conditions of the NPDES Permit, the Jackson County Erosion and Sedimentation Code, the 401 Water Quality Certification, and North Carolina law.

Plaintiffs filed a Complaint in the above-styled action on September 3, 2021, alleging claims under the CWA and North Carolina law similar to those alleged in the above-referenced notice of intent to sue letter. Among other things, Plaintiffs alleged that the above-referenced permits and laws required and continue to require that the development of the High Hampton property and other properties be subject to the design, installation, inspection, and maintenance of erosion and sedimentation controls necessary to prevent off-site sedimentation and discoloration of streams downstream of the High Hampton Property. Defendants have filed a motion to dismiss the Complaint, which was denied without prejudice to re-file shortly after the Court was appraised of the Parties' agreement to resolve this matter.

3

Defendants contend that Plaintiffs' claims are without merit, deny Plaintiffs' allegations of ongoing violations, and deny liability for all claims alleged by Plaintiffs in the notice of intent to sue letter and citizen suit.

Plaintiffs' Complaint asserts causes of action under the citizen suit provisions of the federal CWA, provisions of North Carolina's Sedimentation Pollution Control Act, and common law claims for trespass and nuisance. Plaintiffs' Complaint seeks declaratory and injunctive relief, imposition of civil penalties, compensatory and general damages for alleged injuries to property, punitive damages, and an award of litigation expenses, including attorneys' fees. Defendants contend that Plaintiffs are not entitled to any relief whatsoever.

During the pendency of the above-referenced motion to dismiss, Plaintiffs and Defendants negotiated an arms-length settlement of Plaintiffs' claims, the terms of which settlement include the entry of this Consent Decree. The agreement to this Consent Decree by Defendant and the entry of this Consent Decree by the Court shall not be deemed to constitute an admission by Defendants of the claims alleged by Plaintiff in its notice of intent to sue letter or the Complaint. Solely for the purposes of this Consent Decree, Plaintiffs and Defendants (collectively, the "Parties") stipulate that the Court has jurisdiction over the Parties and the subject matter of this action under section 505(a) of the CWA, 33 U.S.C. § 1365(a), together with supplemental jurisdiction over the state law claims alleged in the Complaint.

4

The Parties agree that settlement of this matter is in the best interest of the Parties, the environment, and the public and that entry of this Consent Decree without additional litigation is an appropriate means of resolving this action. "A court entering a consent decree must examine its terms to ensure they are fair and not unlawful." *Smyth ex Rel. Smyth v. Rivero*, 282 F.3d 268, 280 (4th Cir. 2002). The Parties agree that this Consent Decree is fair, reasonable, equitable, does not violate the law or public policy, comes within the scope of the pleadings, and furthers the broad objectives upon which Plaintiffs based the Complaint.

The Parties stipulate to the entry of this Consent Decree without trial, adjudication, or admission of any issues of fact or law regarding the claims and allegations set forth in Plaintiffs' notice of intent to sue and Complaint.

By entering into this Consent Decree, Defendants do not admit Plaintiffs' allegations of past or ongoing violations and expressly deny liability for all claims alleged by Plaintiffs in the notice letter and this action, including the state law claims.

The signatories for the Parties below certify that they are authorized by the party they represent to enter into these Stipulations and Consent Decree.

5

CHATTOOGA CONSERVANCY, INC.

By: _____
Executive Director


By: _____
CRAIG PROBST


By: _____
NANCY PROBST


HIGH HAMPTON LAND, LLC
HIGH HAMPTON RESORT, LLC
DANIEL COMMUNITIES, LLC
DANIEL COMMUNITIES MANAGEMENT CORPORATION

By: _____
Chief Financial Officer

6

CHATTOOGA CONSERVANCY, INC.

By: _____
Executive Director


By: _____
CRAIG PROBST


By: _____
NANCY PROBST


HIGH HAMPTON LAND, LLC
HIGH HAMPTON RESORT, LLC
DANIEL COMMUNITIES, LLC
DANIEL COMMUNITIES MANAGEMENT CORPORATION

By: _____
Chief Financial Officer

CHATTOOGA CONSERVANCY, INC.

By: _____
Executive Director

By: _____
CRAIG PROBST

By: _____
NANCY PROBST

HIGH HAMPTON LAND, LLC
HIGH HAMPTON RESORT, LLC
DANIEL COMMUNITIES, LLC
DANIEL COMMUNITIES MANAGEMENT CORPORATION

By: _____
Chief Financial Officer

## II.    ORDER AND DECREE.

THIS MATTER came before the Court upon the foregoing Stipulations of the Parties and joint motion for entry of Consent Decree. Having considered the foregoing Stipulations and the terms and conditions set forth below, the Court hereby ORDERS, ADJUDGES, and DECREES as follows:

1.    This Court has jurisdiction over the Parties and the subject matter of this action pursuant to section 505(a) of the CWA, 33 U.S.C. § 1365(a), together with supplemental jurisdiction over the state law claims alleged in the Complaint.

2.    This Consent Decree shall inure to the benefit of, and be binding upon, the Parties and their successors, assigns, officials, agents, representatives, officers, directors, and employees. Changes in the organizational form or status of a party shall have no effect on the binding nature of this Consent Decree or its applicability.

3.    This Consent Decree and any injunctive relief ordered within applies solely to Defendants' operation and oversight of certain activities at the High Hampton property as set forth in paragraph 6.

4.    With the exception of Defendants' obligations pursuant to a private written settlement agreement entered between Plaintiffs and Defendants concurrent with their execution of this Consent Decree, this Consent Decree is a full and complete settlement and release of all claims alleged or which could have been alleged against Defendants and their successors, assigns, officials, shareholders,

7

contractors, agents, representatives, officers, members, managers, investors, directors, insurers, affiliated associations (including homeowner and community associations), attorneys, and employees, and each of them (hereinafter, the "Released Entities"), in Plaintiffs' notice of intent to sue letter and Complaint, and all other claims of a similar nature against the Released Entities arising out of the development of the High Hampton property, whether known or unknown, as such claims may exist as of the date of entry of this Consent Decree. These claims are released and dismissed with prejudice as to the Released Entities. For the avoidance of doubt, no purchasers of lots within the High Hampton property, nor their engineers, architects, consultants, contractors, or agents, shall be deemed to be a Released Entity or the beneficiaries of the dismissal of the Complaint or the releases contained in this Consent Decree.

5.     This Consent Decree is a settlement of disputed facts and law relating to Plaintiffs' allegations of Clean Water Act violations. It is not an admission or adjudication regarding any allegations by Defendants in this case or of any fact or conclusion of law related to those allegations. By entering into this Consent Decree, Defendants do not admit and expressly deny liability for all claims alleged by Plaintiffs in the notice letter and citizen suit. Nothing in this Consent Decree shall operate to impose upon the Defendants or the Released Entities legal responsibilities for erosion and sedimentation control compliance on lots that they do not own or for

8

work they are not performing. The Parties to this Consent Decree acknowledge that the owners of private lots and the contractors retained to perform work on those lots are the entities responsible for ensuring compliance with all laws and regulations regarding erosion and sedimentation control, and further acknowledge that Defendants have no authority to enforce compliance with state, local, and federal laws and regulations regarding erosion and sedimentation control.

6.     Defendants agree to perform as follows for purposes of this Consent Decree:

a.     High Hampton Land, LLC, as Declarant of the High Hampton Community Association, Inc., and pursuant to its powers under the Declaration of Covenants applicable thereto, shall no later than fifteen (15) business days following entry of this Consent Decree amend its High Hampton Patterns for Placemaking Design Guide for Planning & Architecture (hereinafter, "Design Guide") in the form attached hereto as Exhibit A, which shall thereby become binding upon the owners of lots subject to those guidelines within the High Hampton property. The lots subject to the Design Guide are shown in the numbered lots in Exhibit B. In conjunction with such amendment, High Hampton shall cause or require the following with respect to such amended Design Guide and its application:

i.     For each lot, prior to the conduct of land disturbing activity thereon, the owner of such lot shall be required to submit to High Hampton's Architectural Review Committee an erosion and sedimentation control plan developed by a licensed civil engineer or licensed landscape architect which complies with the Design Guide with respect to erosion and sedimentation controls;

ii.     High Hampton shall cause a cause a person familiar with the erosion and sedimentation control provisions in the

9

Design Guide to conduct and document (including photos) an inspection of erosion and sedimentation controls and conditions of each lot under construction at High Hampton twice per week;

iii.  Prompt reporting by High Hampton to Jackson County, North Carolina, of potential violations of Jackson County erosion and sediment control rules and regulations observed on the subject lots;

iv.  Ability by High Hampton to take actions outlined in the Design Guide and above-referenced Declaration of Covenants for failures of lot owners and builders to comply with erosion and sedimentation control requirements; and

v.  Defendants shall cause the reports of the twice-weekly inspections and referrals to the County to be provided to Chattooga Conservancy upon request.

b.  Within five (5) business days of the Court's entry of this Consent Decree, Defendants shall make a settlement payment in the amount of Seven Hundred Fifty Thousand and No/100 ($750,000.00) to be made to Plaintiffs for purposes of (a) funding projects and programs by the Chattooga Conservancy to preserve, protect, and restore the Chattooga River watershed, including but not limited to Fowler Creek and the Chattooga River downstream of its confluence with Fowler Creek; (b) settling the Chattooga Conservancy's claims; (c) settling the Probsts' claims; and (d) settling Plaintiffs' claims for expenses, including reasonable attorney's fees, in anticipation of and connection with the above-styled action.

c.  The Parties shall cooperate in good faith with respect to the performance of the terms of this Consent Decree, which cooperation shall include, with reasonable notice, providing access, to the extent that the property is owned by Defendants, to the Chattooga Conservancy and its representatives for purposes of inspection of erosion and sedimentation controls and conditions at the High Hampton property.

10

7. A "force majeure" event is any event outside the reasonable control of Defendants and their representatives, affiliates, contractors, subcontractors, and consultants that prevents or causes a delay in performing tasks required by this Consent Decree that cannot be cured by due diligence. Prevention or delay in performance of a task required by this Consent Decree caused by a force majeure event is not a failure to comply with the terms of this decree, provided that Defendants timely notify Plaintiffs of the event, the steps that Defendants will take to perform the task, and the projected time that will be needed to complete the task. Defendants will notify Plaintiffs of the occurrence of a force majeure event as soon as reasonably possible but, in any case, no later than five (5) days after Defendants become aware of the occurrence of the event. In such event, the time for performance of the task will be extended for a reasonable period of time following the force majeure event. If a force majeure event prevents the implementation of any of the tasks required by this Consent Decree, the Parties will negotiate in good faith to agree to an alternative action with the same goal and effect of the task prevented by the force majeure event. By way of example and not limitation, force majeure events include:

    a.    Acts of God, war, insurrection, or civil disturbance
    b.    Actions or inactions of third parties over which defendant has no control
    c.    Restraint by court order or order of public authority
    d.    Strikes

11

e.     Earthquakes
f.     Fire
g.     Lightning
h.     Sabotage
i.     Terrorism or threats of terrorism.

8.     This Court retains jurisdiction over this matter and, while this Consent Decree remains in force, this case may be reopened without a filing fee so that the Parties may apply to the Court for any further order or relief that may be necessary regarding compliance with this Consent Decree or to resolve any dispute regarding the terms or conditions of this Consent Decree until it is terminated. A precondition to any application to the Court under this paragraph is that the Parties must first seek to resolve the dispute themselves as follows: (1) the party identifying or wishing to raise an issue or dispute must provide the other party a written notice detailing the nature of the issue or dispute; and (2) within thirty (30) days of receipt of such notice, the Parties shall meet and confer regarding the issue or dispute. If no resolution is reached at that meeting or within thirty (30) days of the written notice, whichever occurs first, either party may file a motion with this Court to resolve the dispute. In any action to enforce this Consent Decree, the Court shall apply the same standard applied by courts in awarding fees and costs under section 505(d) of the CWA, 33 U.S.C. 1365(d).

9.     This agreement shall take effect upon entry of the Consent Decree by the Court.

10.     The provisions of this Consent Decree, except for Plaintiffs' releases of claims described in paragraph II.4, shall terminate three (3) years from the date this Consent Decree is entered by the Court.  Plaintiffs' releases of claims described in paragraph II.4 will survive the termination of all other provisions of this Consent Decree.

11.     All notices and other communications regarding this Consent Decree shall be in writing and shall be given on a first priority basis via e-mail to the following email addresses, or to such other email addresses as the Parties may designate by written notice, and on a second priority basis by overnight delivery service or by delivering the same by hand to the addresses stated below:

For Plaintiffs:

Craig and Nancy Probst
13259 Robert Walker Dr
Davidson, NC 28036
Probstcraig@gmail.com
LogcabinNP@mindspring.com

Chattooga Conservancy
Attention: Executive Director
867 Chattooga Ridge Road
Mountain Rest, SC 29664
info@chattoogariver.org

cc: Craig Pendergrast
Continuum Legal Group LLP
5605 Glenridge Drive
Suite 600
Atlanta, GA Georgia 30342
cpendergrast@continuumlg.com

For Defendants:

Owen Schultz
572 Highway 107 South
P.O. Box 1890
Cashiers, NC 28717
oschultz@danielcommunities.com

Stephen Rowe
2000 Morris Avenue
Suite 1300
Birmingham, AL 35203
srowe@myafo.com

cc: Harlan Prater
Lightfoot, Franklin & White, LLC
400 20th Street North
Birmingham, AL 35203
hprater@lightfootlaw.com

13

12.     With the exception of a private written settlement agreement entered between Plaintiffs and Defendants concurrent with their execution of this Consent Decree, this Consent Decree constitutes the entire agreement between the Parties with respect to the claims alleged in Plaintiffs' Complaint. There are no other or further agreements, either written or verbal, relating to those claims.

13.     Each party acknowledges that it has sought and obtained the advice of its own independent legal counsel before executing this Consent Decree. The Parties acknowledge that they have had the opportunity to freely negotiate the terms of this Consent Decree.

14.     Each party shall, at the request of the other, execute, acknowledge, and deliver whatever additional documents, and do such other acts, as may be reasonably required in order to accomplish and/or carry out the intent, spirit, and purposes of this Consent Decree.

15.     The Parties recognize that, pursuant to 33 U.S.C. § 1365(c)(3), no consent judgment can be entered in a CWA suit in which the United States is not a party prior to forty-five (45) days following the receipt of a copy of the proposed consent judgment by the U.S. Attorney General and the Administrator of the U.S. Environmental Protection Agency ("U.S. EPA"). Therefore, upon the filing of this proposed Consent Decree by the Parties, Plaintiffs will serve copies of it upon the Administrator of the U.S. EPA and the U.S. Attorney General.

14

16.   The Parties further recognize that this Consent Decree does not serve to release any claims that the United States may bring with respect to the subject matter of this Consent Decree.


SO ORDERED AND DECREED, this 13 day of *December* 2022.

Martin Reidinger
Chief United States District Judge
United States District Court for the Western District of North Carolina

15

# EXHIBIT A

**Site Preservation**

## 3.4.1 - GENERAL CONSIDERATIONS

*Design Intent*

Our conservation easement containing Chimney Top and Rock Mountain provides the setting that makes High Hampton one of the most magnificent and desirable communities in the region. Every effort must be made to protect the unparalleled beauty found in this unique mountain setting. It is the intent of the ARC through these Guidelines to ensure the highest standard of site preservation and design excellence for High Hampton.

Disturbed areas are not only unsightly but also susceptible to erosion. In this climate these wounds heal slowly. Damaged or disrupted habitats (shrubs, trees, rocks, ground cover, etc.) should be restored to their original conditions with approved materials. To needlessly destroy and not repair the very elements that attract us to High Hampton violates the interests of all Owners.

Everyone involved in High Hampton - Owner, Engineer, Architect, Landscape Architect, Contractor, and Subcontractor - is bestowed with the responsibility to care for and keep this pristine environment in its natural state.

## 3.4.2 - SITE GRADING

*Design Intent*

Site grading is the reshaping of the ground forms for the purpose of accommodating structures and for maintaining or re-establishing drainage patterns. Site grading is often overlooked or overdone. When complete, the site should reflect pleasing, natural forms that take shape gradually, lending the landscape a more naturalized appearance. Abrupt mounds or sharp forms should be avoided.

Proposed grading should blend into the site and preserve natural drainage patterns. Existing site character must be maintained by minimizing grading and tree removal.

*Guidelines and Required Tasks*

- Where existing landforms must be altered as a part of the construction process, the altered areas should be re-created in a manner that replicates existing natural conditions found before construction disturbance.

To ensure every consideration is given to producing a design well integrated into the adjacent landscape composition, a Site Plan showing conceptual grading, drainage, existing and proposed grade must be prepared and included in the design submittal for all homesites.

- The completed composition of landforms should appear natural within their setting.

- Creating large, level-building pads is not al- lowed at High Hampton. Terracing of homesites must not be apparent in the finished appearance of the landscape.
- All grading must take place clear of the set-backs for the purposes of creating a natural appearing transition between homesites and other adjoining parcels.
- Topographic transitions from building locations to setbacks must appear natural.
- All homesite grading must be limited to construction of driveways and that area reasonably necessary for authorized construction.
- Except for driveway access, erosion control, or utilities, no grading is allowed within the setback areas of any homesite.
- Grading near the setbacks should not result in abrupt transitions to adjacent homesites or streets.
- No excessive excavation or fill will be permitted on any homesite. On sensitive site, grading may not be allowed at all.
- Where retaining systems are required, they must adhere to the height requirements and special considerations addressed in Sections 3.4.3 and 3.4.4.
- All site grading must be kept to the absolute minimum necessary to accommodate the construction of the residence and appurtenances.
- No excavation, fill, or removal of trees and other vegetation will be permitted until the applicant's Final Design Submittal has been ap- proved, in writing, by the High Hampton ARC. Failure to abide by these procedures may result in fines and possibly affect building privileges in High Hampton.
- All graded slopes must be re-vegetated.
- Excess fill or soil may not be placed on a homesite; it must be legally disposed of out- side of High Hampton.
- All site grading must provide for transitions into grades on all sides of the homesite to create flowing, continuous landscape.
- Grading and / or trenching must not occur within the root zones of trees to be preserved.
- Trenching must be confined to areas noted on the Site Plan, clear of setbacks except for work related to the driveway and utilities.
- Manual excavation methods and moisture blanketing may be necessary to preserve and protect exposed root systems. See Section 3.4.9 for more information on what to do if tree roots are exposed.



Figure 3.4.2

***NOT THIS:***

Abrupt transitions in the landscape, excessively high retaining walls, and excessively high building height

### 3.4.3 - FOUNDATIONS, GRADING & SLOPING SITES

*Design Intent*

Grading and the topography of the site are fundamental to understanding mountain architecture. Proposed topography must be integrated into the design of the architecture and vice-versa.

*Guidelines and Required Tasks*

- No Structure may be constructed on portions of a homesite where the slope exceeds thirty (30%) percent.
- Cut and fill slopes may have a maximum ratio of 2:1 horizontal to vertical unless supported by an approved retaining wall.
- For the purpose of slope stabilization, all recreated and disturbed slopes must be revegetated per the requirements in Section 3.5.2.
- In addition to basic grading, sloping sites should employ designs that take up the grade changes within the dwelling's footprint; the location and design of the proposed structures must relate to the existing terrain.
- Every attempt must be made to minimize cut and fill necessary for the construction of a home.
- Retaining walls and level building pads may be utilized only when absolutely necessary.
- The ARC, in accordance with the requirements of government agencies, regulates grading and excavation of homesites.
- Pad grading for the intention of providing concrete slab foundations is prohibited except for garages, terraces, outbuildings, and basements. The intent of this requirement is to limit as much as possible the reshaping of the site. Where this intent is met, a variance for pad grading mat be requested from and granted by the ARC.

### 3.4.4 - RETAINING & SITE WALLS

*Design Intent*

Retaining walls are a fact of life in mountain architecture and site planning. Retaining walls constructed of natural stone materials with rich textures, color palettes and that are an extension of the native stone outcroppings are desirable. Site walls should look natural, belonging to the site as much as possible in form, color and composition.

Figure 3.4.3



The maximum buildable grade is 30%

*Guidelines and Required Tasks*

- Houses must be designed to fit their sloping site rather than the site made to fit an inappropriate house.
- Stepped native stone retaining walls and landscaping should be used on newly created slopes to provide more rapid re-vegetation.



**Figure 3.4.4**

- Stonework should appear organic in nature, using a variety of sizes, and minimize visible mortar or other support devices.
- Preferred rocks for use in site walls are substantially sized, weathered, gray granite or surface rocks that appear similar to those, found on the homesite.
- While site walls may be dry stacked, they should be constituted of stones sufficiently large enough to discourage disassembly.
- Exposed site walls not directly associated with the home must be made of stone (rather than concrete or wood).
- Railroad ties will not be allowed in High Hampton.
- Retaining surfaces greater than four (4) feet must occur by way of multiple walls or systems, separated by a minimum planting width of two (2) feet.
- Boulder retaining walls must have a batter (1:12 minimum vertical offset). Veneered walls may be vertical.
- Site walls not associated with the structure of the home or other building should be used only where necessary for slope stabilization and must not protrude above grade.

## 3.4.5 - SITE DRAINAGE

*Design Intent*

Site topography (existing and proposed) should be designed to blend in with natural drainage patterns.

*Guidelines and Required Tasks*

- Plans for site grading and drainage must be consistent with minimum disruption to the homesite, without altering natural drainage patterns as runoff leaves the homesite, and without causing conditions that could lead to soil erosion.
- In order to protect water quality, all runoff from impervious surfaces, such as paving and roofs, must be absorbed on each homesite and must not flow onto adjacent properties.
- Storm water swales present at High Hampton have been designed for use by High Hampton infrastructure and may not be used by individual homesites.
- Storm water measures must occur clear of setbacks except for that related to the driveway. The ARC will work closely with Owners of homesites with designated drainage easements to ensure a reasonable building envelope is achievable.

*On-site drainage must be designed to reintroduce as much water back into the groundwater system as possible and to keep adjacent lands in their natural state.*

- Existing natural drainage corridors must not be altered.
- On-site drainage, including roof drainage, must be directed away from all structures.
- Rock lined swales should be designed to ap- pear as a mountain stream with varying size natural boulders and stones randomly placed at the swale edges. The swale bottom should be lined with smaller gravel type stone where appropriate. In addition, it should not travel in a straight line. A meandering course will slow flow and allow better infiltration and less erosion. The Owner shall maintain all drainage channels installed as part of the homesite improvement.

*For more information on drainage as it relates to Best Management Practices, please refer to Sections 3.4.10 and 3.4.11.*

## 3.4.6 - CULVERTS

*Design Intent*

In order to access some homesites, the driveway may bridge a drainage swale alongside the road. The applicant must design and size a culvert (drain- age pipe) at this crossing per the minimum requirements set forth herein or as dictated on site.

*Guidelines and Required Tasks*

- The minimum driveway culvert diameter size across roadside drainage swales shall be fifteen (15) inches. Driveway culverts shall be either helical corrugated steel pipe (CSP) or high-density polyethylene (HDPE) smooth interior wall.
- The exposed flared ends of a culvert or drain- age pipe must be aesthetically finished with mortared or dry-laid stone headwalls. The stone must meet the color, material and slope stabilization requirements set forth in Section 3.4.5.
- Pipe ends must not be visible from the roadway.

### 3.4.7 - MAINTAINING EXISTING FOREST

*Design Intent*

- To protect and preserve the character of High Hampton's forest; no cutting or digging is allowed without prior approval. The following guidelines describe changes that may be allowed to the forest landscape. These guidelines define the permitting process and restoration requirements.



Figure 3.4.5

- New construction within the Construction Activity Zone (3.4.13); the Architectural Review Committee will review during the Preliminary and Final Design reviews. All removal, preservation and restoration should be indicated on the Site and Landscape Plans.
- Within buffers:
- Stream buffers-No work is allowed.
- Other buffers-Variance submittal must be made to the Architectural Review Committee, and written approval issued.
- Other areas-Variance submittal must be made to the Architectural Review Committee.

*Guidelines and Required Tasks*

Large Deciduous Trees:
This group includes ash, gum hickory, locust, maple and oak.
- To maintain and re-establish the forest overstory canopy, for trees six (6) inches diameter at breast height (DBH) or larger that are removed, planting plans must include replacement trees (native, deciduous canopy trees) per the following ratios: Calculate total # of canopy trees removed per the above specifications = "cT"
- Deciduous canopy trees @ 25' + height
  (1) per project
- Deciduous canopy trees @ 18'-20' height
  0.l cT *(2) minimum
- Deciduous canopy trees @ 12'-14' height
  0.l cT *(3) minimum; this is typically a 2"-2.5" caliper tree
- Deciduous canopy trees @ 8'-12' height
  0.2 cT *(4) minimum; this is typically a 1"-1.5" caliper tree

- Deciduous canopy trees @ 4'-6' height
  0.4 cT *(8) minimum
- Deciduous canopy tree bare root saplings
  (10) per project
- [for example, if a new homesite removes 20 canopy trees of 6" DBH or greater (T=40), the planting plan would need to include the following:
- (1) 25' height deciduous canopy tree
- (2) 18'-20' height deciduous canopy trees
- (3) 12'-14' height deciduous canopy trees
- (4) 8'-12' height deciduous canopy trees
- (8) 4'-6' height deciduous canopy trees
- (10) bare root saplings



Small Flowering Deciduous Trees:
This group includes alder, birch, redbud dog- wood, ironwood, spicewood and witch hazel.

- To maintain the forest understory, for trees two (2) inches DBH that are removed, planting plans must include replacement trees (native, deciduous canopy trees) per the following ratios:
- Calculate total # of small trees removed per the above specifications = "sT"
- Small flowering tree @ 12' height (1) per project, minimum
- Small flowering tree @ 8' height 0.5sT *(5) minimum
- Small flowering tree @ 4'-6' height 0.5 sT *(5) minimum
- Small flowering tree bare root saplings (10) per project
- *These can be located within the natural area outside the setback

Evergreen Trees:

This group includes hemlock and pine.

- Any size hemlock may be removed.
- For every evergreen removed, planting plans must include replacement trees per the following ratios:
- Calculate total # of evergreen trees removed due to construction activity = "eT"
- Evergreen Tree @ 18'-20' height 1.0 eT *(2) minimum per project
- Evergreen Tree @ 8'-12' height 2.0 eT

Deciduous Under-story Plants:

This group includes azalea, blueberry, buckberry, fern and other low growing deciduous species both woody and herbaceous.

- These plants may be pruned to eighteen (18) inches.
- Removal is discouraged.

Evergreen Under-story Plants:

This group includes rhododendron and laurel.

- Removal and pruning is discouraged. If pruning is desired, qualification of workers must be verified.
- General:
- All replacement trees must survive.
- Location of replacement trees should be with- in the same area as removal occurs.
- The under-story root mat is not to be disturbed (broken) by equipment or workers.
- Upon completion of work, the area should ap- pear undisturbed.
- Topping of trees is not allowed.
- The use of spikes by tree climbers for pruning is not allowed (spikes may be used on those trees being removed).
- Burning is not allowed.
- Submissions for removal or pruning of trees and plants should include the following:
- Trees or plants to be removed should be flagged with RED ribbon.
- Trees or plants to be pruned should be flagged with ORANGE ribbon.
- Trees to have limbs removed; submit picture of each tree with limbs to be removed marked
- List of all replacement plants and confirm source of plants.
- List of workers or company that will be per- forming the work.

**3.4.8 - TREE STUMPS**

An applicant may choose whether to retain or to remove existing stumps from the homesite. Tree stumps may be flush cut, ground or pulled. If tree stumps are to be pulled, i.e. grubbed, in the course of site development, then construction phase erosion and sedimentation controls must be established in accordance with Section 3.4.10 below.

Stump work (type, access, locations and specific directions) must be indicated on submitted plans.

A few very old, very weathered chestnut stumps can be found a High Hampton. Often these lichen-covered stumps are taller than newer stumps (as they were cut with a hand saw). Where possible, Owners are encouraged to retain these historical relics, as they add

character to the community.

### 3.4.9 – PRESERVATION & PROTECTION OF TREES & OTHER SITE FEATURES

*Design Intent*

In order to protect the natural landscape and defer to the scenic environment, the location and design of proposed structures and landscape must relate to existing terrain and vegetation. The area of soil and vegetation disturbance on each homesite must be limited to that required for necessary construction and landscaping purposes. Except where required by access and other purposes described in Section 3.4.14, there must be no disturbance in setbacks and areas to be left in a natural state without prior ARC permission.

Tree, brush, and rock removal must be limited to that reasonably necessary for the construction of a home and its protection from fire.

We recommend living in your home for one year prior to any view clearing.

As part of the Pre-Design meeting, certain trees and other site features are designated for preservation and therefore must be protected during the construction of the home. The ARC has the right to flag major terrain features, trees or plants (which are to be fenced or barricaded by specific means) for protection during construction.

*Guidelines and Required Tasks*

- Grading is not allowed within the drip lines of trees to be saved unless otherwise noted during the Pre-Design Conference agreement. This means foundation walls, footings, graded driveways, retaining walls, etc. must be kept clear of the canopies of these trees.
- All instructions for protection of natural site features must be noted and graphically indicated on submitted plans.
- Compaction of soil within the drip line of a tree to be preserved is not permitted.
- Trees or plants within the Construction Activity Zone that are to be preserved must be marked by flagging and protected by fencing or other approved barriers at all times.
- Any trees or branches removed during construction must be promptly cleaned up and removed from the construction site.
- Protection of trees close to the building may require fencing on one or more sides of the tree. Exposed soil of these trees must be protected from foot and equipment traffic by use of a bridging system that allows air and water to reach the soil.

### 3.4.10 – CONSTRUCTION PHASE EROSION AND SEDIMENTATION CONTROL BEST MANAGEMENT PRACTICES

High Hampton is at the cutting edge of a new generation of communities that work to preserve the pristine landscape that attracts such strong development interest.

Much of High Hampton drains into ecologically sensitive streams and wetlands in the Fowler Creek and Chattooga River watersheds that are strictly protected by various governmental agencies. Protection of these sensitive streams and wetlands, including our own Hampton Lake and Jewel Lake, is a condition of development at High Hampton. The delicate ecological balance can be upset by a minimal amount of sediment, such as eroded soil, water-borne pollutants, or a few drops of oil from a piece of machinery. In short, there is a strict set of requirements designed to keep soil from eroding and pollutants carried by surface water runoff into these ecologically sensitive areas.

Federal, state, and local laws and regulations impose specific requirements for erosion and sedimentation control for land disturbing activities in Jackson County, North Carolina, and it is the responsibility of You as Owner, working with your engineer, architect, landscape architect, and contractor, to understand and comply with all applicable laws and regulations regarding erosion and sedimentation control. The waters in the High Hampton area are designated both Trout Streams/High Quality Waters and Outstanding Resource Waters, and 30-foot stream buffer zones generally apply, and erosion and sedimentation control design criteria are required under applicable law for land disturbing activities. Relevant laws and regulations regarding buffer zones and erosion control and sedimentation controls must be consulted and followed. *See*, for example, 15A N.C. Admin. Code 02H.1021(7) (2022); Jackson County, N.C., Unified Development Ordinance § 5.3.8(c)(ii) (2019); N.C. Dep't Env't Quality, General Permit No. NCG010000 § B(5) (as applicable). "Erosion and sedimentation control measures, structures, and devices within HQW [High Quality Water] zones shall be so planned, designed, and constructed to provide protection from the run-off of the 25-year storm." *See* Jackson County, N.C., Unified Development Ordinance § 5.3.8(c)(ii) (2019). In designing and implementing erosion and sedimentation control plans, the relevant rainfall-event data for our local area can be accessed by use of the following link:
https://www.nrcs.usda.gov/wps/portal/nrcs/detailfull/national/water/?cid=stelprdb1042901.
The most recent calculation of such a 25-year storm event identifies such a storm as one that involves 9.75" of rainfall over a 24-hour period.

You as Owner, working with your engineer, architect, landscape architect, and contractor, should work to minimize the area of the site in which land is disturbed and be particularly sensitive to attempt to avoid land disturbance in areas with steeper slopes which are most susceptible to erosion and sedimentation in the construction phase. This means that use of silt fences alone, without additional erosion and sedimentation controls, may not be enough to ensure compliance with the law and the provisions of these Design Guidelines. Erosion control matting and other erosion and sedimentation control measures such as properly designed sediment traps and diversion berms and trenches may also be necessary to meet legal requirements and the performance expected under these Design Guidelines.

Proper design, installation, inspection, maintenance and repair of erosion and sedimentation controls, aka Best Management Practices, at each construction site are required to avoid off-site impacts at High Hampton. Although not complicated, proper design, installation and associated regular maintenance can be expensive and labor intensive. As described below, erosion and sedimentation controls specified by your erosion and sedimentation design professional must be installed before any land-disturbing activity begins. In an effort to reduce erosion and keep soils on each

home site, all exposed raw dirt must be covered with ground mulch and/or other covers listed below as soon as possible after such soils have been disturbed and no later than the time your contractor begins foundation installation and kept covered until final landscaping is installed. Maintenance of these controls is also important between the time that roof sheathing is installed but prior to guttering.

Construction Phase Erosion and Sedimentation Control Best Management Practices that may be specified by your erosion and sedimentation control designer for use at High Hampton include the following:



- Wood mulch
- Silt fencing, including double-row silt fencing
- Gravel or crushed rock (drive-ways only)
- Filter fabric
- Hydro mulch
- Jute netting
- Wood excelsior blanket
- Erosion control blankets or geo-textiles
- Approved chemical mulches or tackifiers
- Filter strips
- Diversion berms
- Sediment traps or ponds

Figure 3.4.10
Appropriate erosion control installation.

*Guidelines and Required Tasks*

- Compaction of existing soils must be minimized.
- Rainwater and snow melt should percolate into the ground rather than running along the top.
- Soil exposed by construction activity must be stabilized.
- Prior to the commencement of construction activities, including tree stump grubbing, erosion and sedimentation controls (at a minimum, silt fencing) must be installed down gradient of all areas that will be disturbed as part of the development of the site and construction of a home. It may be placed on either the inside or the outside of the Construction Activity Zone. In both cases, the silt fencing must be placed next to the vegetation protection fencing unless saving a natural feature requires placement elsewhere. .Erosion and sedimentation controls must be designed and installed to account, among other things, for storm water entering the site from upgradient.
- The silt fencing must be dug six (6) inches into the ground and must be backed with a material that helps it maintain its structural integrity through the life of the project. Silt fencing must use metal stakes on 4' centers. This backing must be strong enough to weather heavy rains and the winter snow melt from what could potentially be a very muddy construction site.
  - It is the primary responsibility of the Owner and Contractor to effectively install and maintain Erosion and Sedimentation Control

Best Management Practices over the duration of the construction project. Failure to install and maintain these measures may result in fines and possible corrective action by High Hampton. If corrective action is taken to remedy the situation, the Owner will be charged for expenses related to that action. As part of the twice weekly inspections of active construction sites, a representative of the High Hampton Community Association will determine that (1) the erosion and sedimentation control plan required by Section 5.5 has been installed per the plan, (2) That once installed the erosion control system is being maintained throughout the duration of the construction project, and (3) That the erosion control system is effective in keeping the impacts of erosion and sedimentation within the construction activity zone. If the erosion and sedimentation control plan is found not to be effective, then it must be amended appropriately. The Owner and Contractor of sites not found to meet the erosion and sedimentation control requirements will be notified in writing within 24 hours of such deficiency being discovered, and High Hampton will report such deficiency to The Jackson County Inspections Department for further compliance and enforcement purposes within 48 hours of giving notice to the Owner and Contractor with respect to such deficiency.

## 3.4.11 POST-DEVELOPMENT BEST MANAGEMENT PRACTICES

Post-Development Best Management Practices are defined as structural and non-structural practices proven most effective in soil erosion control and management of surface runoff after the construction phase is complete.

Impaired water quality from developed sites is often caused by the flow of non-point source pollutants into streams, rivers, and lakes. Control of this source of pollution at High Hampton is required by, at a minimum, implementing Best Management Practices at all homesites. Best Management Practices do not have to be complicated to be effective.

*The goal is to (1) stabilize soil, (2) prevent erosion and (3) divert runoff from impervious surfaces into infiltration systems within each homesite.*

The first two (2) items can usually be satisfied by re-vegetating areas with plants that existed prior to the disturbance of that area, and in steeper areas, by the use of silt barriers, temporary retention and infiltration ditches, and stone retaining walls. The most effective Best Management Practices are those that replicate natural conditions.

Paved driveways and walkways supported by infiltration mechanisms are the most effective way to eliminate erosion and control dust caused by car and foot traffic.

The following is a list of Permanent Best Management Practices that may be utilized at

High Hampton provided they are installed in a manner that aesthetically compliments the surrounding landscape and color palette.

Slope Stabilization Practices:

- Stone retaining wall (Section 3.4.4)
- Stone rip-rap (Sections 3.4.2 and 3.4.3)
- Sub-surface drains
- Re-vegetation (Section 3.5.2)

Infiltration Systems:

- French drains
- Infiltration trench (Section 3.4.5)

## 3.4.12 - CONSTRUCTION SITE ACCESS

The approved driveway will be the only construction access to any homesite. The access shall be defined by securely installed protection fencing located on the future driveway at a maximum width of twelve (12) feet. Construction activity, storage or staging may not occur anywhere in the front setback except at the access, regardless of whether those areas have been previously disturbed. Both the development roadway and the shoulder of the roadway shall be protected during home construction. The driveway for each home may not cut into the road supporting shoulder.

Dust and erosion must be controlled during construction. Any mud or debris tracked onto the roadway must be cleaned up daily. Mud mats that meet Jackson County's erosion control requirements should be installed where the driveway meets the developments road.

## 3.4.13 - CONSTRUCTION ACTIVITY ZONE

When planning and designing for a homesite at High Hampton, it is important to keep the building process in mind. Construction activity is closely monitored so that the majority of the High Hampton landscape remains in its natural scenic state. Construction activity in the setbacks is generally not permitted. Therefore, licensed engineers, architects, and/or landscape architects must be careful to design the home to be built within the given constraints and are responsible for locating a reasonable Construction Activity Zone on the Site Plan. In addition, and as referenced in Section 3.4.10, there are specific buffer zones that must be maintained around springs and streams pursuant to applicable erosion and sedimentation laws and regulations.

The Construction Activity Zone is the area in which ALL activities related to building a home must occur. No construction activity may take place outside of this area at any time. It is established during the Design Phase of the project and then reviewed in greater detail at the Pre-Construction Meeting.

*Guidelines and Required Tasks*

- The use of, or transit over, any other homesite or common area, natural area or setback out-side the limits of construction or as defined in the CC&R's is prohibited.

- Construction personnel must refrain from parking, eating, and depositing refuse or construction material on any neighboring home- site, right-of-way, meadow, or common area or anywhere outside of the building or paving footprint.
- All construction activity must remain within the bounds of the Construction Activity Zone, as agreed during the on-site Pre-Design Conference and as depicted in the approved final Site Plan.
- Four (4) foot high green vegetation protection fencing must delineate the boundaries of the Construction Activity Zone at all times until construction activity is completed, unless the ARC approves (in advance) a different type of barrier. This boundary must be present and complete prior to beginning construction and must remain intact, unmoved, and complete until outdoor construction activity (except landscaping) has been completed. It is the responsibility of the contractor to maintain this fencing at all times.
- Areas within the Construction Activity Zone must allocate for staging, refuse disposal and collection, a sanitary closet, material deliveries and storage and circulation between these areas.
- All deliveries and access must occur through the future driveway.



Figure 3.4.13

## 3.4.14 - CONSTRUCTION ACTIVITY IN SETBACK AREAS

- Generally, vegetation fencing must stay clear of setback areas except in the following cases. These exceptions do not apply so as to allow encroachment of buffer zones required by applicable erosion and sedimentation laws and regulations.
- Crossing the front setback via a single access no wider than twelve (12) feet including the proposed driveway. An allowance of twenty (20) feet will be made on driveways that require grading.
- Construction activity in protected stream buffer setbacks and wetland areas is not allowed and is against the law.

- Temporary Construction Activity Zones may be up to ten (10) feet wide to accommodate utility trenching. Immediately following utility trench backfilling, fencing in setback areas must be removed and the disturbed areas re-vegetated and stabilized.
- Temporary construction activity may occur in setback areas to accommodate connecting utility lines to the home and for soil stabilization and re-vegetation. The boundaries of such disturbance must be minimized so as not to remove important vegetation or site features and must be clearly marked on the plans. Access to these areas must occur from within the Construction Activity Zones.
- Site plans differentiate between temporary Construction Activity Zones and those that will remain throughout construction





## 5.5 - PRELIMINARY DESIGN SUBMITTAL

When the Preliminary Design is complete, a digital 24" x 36" to scale copy of the plans in PDF format must be submitted. Only drawings that address the requirements set forth in the Preliminary Design Submittal (below in this section) will be accepted. The required documentation includes a Site Plan, Floor Plans, and Exterior Elevations. These items must be submitted along with the Preliminary Design Submittal form, by the Owner's Agent.

An erosion and sedimentation control plan developed by a licensed civil engineer or licensed landscape architect shall be submitted as part of the preliminary design submittal for obtaining prior approval of proposed improvements and modifications to lots. The erosion and sedimentation control plan shall be designed to meet all jurisdictional government regulations as well as these Design Guidelines. For an example of erosion and sedimentation control measures that should be considered, see North Carolina Department of Environmental Quality General Permit No. NCG010000. *See* Section 3.4.10 above. The plan may be designed and implemented to allow for conversion of erosion and sedimentation control devices to be converted into permanent stormwater management devices as long as they meet these Design Guidelines and are approved by the Architectural Review Committee.

The Design Review Administration fee ($3,000 plus $1 per sq. ft. over 3,000 sq. ft. gross area for new homes and $1,000 for pre-approved plans and $1,000 plus $1 per sq. ft. over 3,000 sq. ft. gross area for major remodels, payable to High Hampton Community Association) is due with the Preliminary Design Submittal. This fee covers the review of the project one time in each phase and one re-submittal at any stage. Additional reviews will carry a $500.00 fee per occurrence.

The on-site staking functions as an important component of the submittal and is necessary to determine whether the proposed home is well sit- ed and whether the drawings accurately depict the proposal. All staking must be performed by a NC licensed surveyor. A digital copy of the staking plan with the stakes marked both in the field and identified on the plan must be submitted to the ARC.

The following checklists contain the Preliminary Design Submittal requirements.

Preliminary Design Submittal General Requirements

- Completed Preliminary Design Submittal form in digital PDF format.
- Design Review Administration Fee
- One (1) Set of Drawings 24" x 36" in scaled digital PDF format.

Site Plan Checklist

- Scale 1" = 20'
- Stamped by a licensed Land Surveyor, registered Civil Engineer, or licensed Landscape Architect
  (add bullet) An erosion and sedimentation control plan developed and stamped by a

licensed civil engineer or licensed landscape architect designed to meet all jurisdictional government regulations as well as the High Hampton Design Guidelines

- Entire property shown with boundaries
- Footprint of all structures with dimensions and finish floor elevations (all levels)
- Easements
- Setbacks
- Existing and proposed topography, minimum 2-foot contours
- Major site features
- All trees six (6) inches or larger in diameter at chest height, species noted, and actual measured drip lines drawn
- Existing utility connection locations with corridor to home
- All trees six (6) inches and larger at chest height, species noted and actual canopy drip lines drawn
- All special terrain features noted for preservation
- Include Landscape Architects for Site Plan submittal
- Using aerial photography or similar information, located and study the relationship be- tween the new home and any existing homes on facilities, including golf, community road- ways and amenities. Indicate any such features on the plans.
- Schematic-level planting plan to show overall planting concepts (screening, buffers, ornamental plantings, healing of native edge, transition zones, etc.)
- Schematic-level plant palette
- Construction Activity Zone:
- Note all trees that are to be removed or re- main with the Construction Activity Zone Temporary Construction Activity Zone for utility trenching (if applicable)
- Driveway and parking area(s)
- Retaining walls with top and bottom of wall elevations

Floor Plans Checklist

- Scale ¼" = 1'-0"
- Floor area of each level
- Attached patios, porches and decks
- Window locations
- Refuse can enclosure location

Exterior Elevations Checklist

- Scale ¼" = 1'-0"
- Minimum of four (4) full elevations
- Finish grade
- Plate heights relative to floor level(s)
- Indication of all exterior materials

**8.11    - INSPECTIONS OF WORK & ENFORCEMENT**

A representative of the Architectural Review Committee may regularly inspect all work in progress and give Notices of Noncompliance when applicable. The Notice of Noncompliance will usually be associated with a fine as described below.

The Owner and Contractor are responsible for violations of the Design Guidelines, Covenants, Conditions and Restrictions, and Association Rules by all parties involved in the construction of improvements on the Owner's homesite. As the designated contact and agent for the Owner during the construction phase, the General Contractor, who must be licensed in the State of North Carolina, is responsible for making sure all parties, including subcontractors, suppliers and crew members, abide by the governing documents, including Association Rules. All construction and enforcement notices will be directed jointly toward the General Contractor and Owner, who together bear responsibility for all construction-related persons entering High Hampton property on behalf of the homesite project. A copy of the Notice of Noncompliance (when as- sociated with a fine) will be distributed to the

Owner, who also bears responsibility. In the event of a violation of the governing documents, a warning may, but not necessarily will, be given for less serious breaches. Violations will be subject to the fines and other corrective action in Appendix D, as amended from time to time.

Furthermore, while Jackson County or other governmental agencies will retain enforcement authority for addressing erosion and sedimentation control deficiencies, High Hampton also has the right to take any action allowed in the Design Guidelines, By-Laws, and/or the Declaration. Such action includes, but is not limited to, the right to remove or remedy the violation and/or seek injunctive relief requiring the removal or the remedying of the violation and the right to take all appropriate action against the contractor. High Hampton shall be entitled to recover the costs incurred in enforcing compliance.

# EXHIBIT B

